[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Nature of Proceedings
By petition filed January 23, 1990, and last amended May 30, 1990, the Department of Children and Youth Services (DCYS) seeks to terminate the parental rights of Maria D., mother and sole legal guardian of Christina D., born October 30, 1986 and, since April 19, 1989, committed to DCYS as neglected and uncared-for within the meaning of Sec. 46b-120 of the Conn. Gen. Stats. (Rev. 1989). A motion to intervene filed by maternal grandparents was granted at the initial hearing on this petition on February 21, 1990, as to disposition only, however. In Re Juv. App. (#10718), 188 Conn. 259, 262 (1982). On September 11, 1990, the intervening grandparents filed a termination of their daughter's parental rights in Christina.
On petitioner's motion, an updated evaluation of Christina was ordered to be conducted by the same clinical psychologist who had seen her in November of 1988, this time to include the child's relationship with the intervening grandparents. Upon receipt of that evaluation, a pretrial to attend, and a trial date certain set or May 30, 1990. On that date, all parties and counsel appeared except for the CT Page 1368 intervening grandparents. At the commencement of trial, Maria indicated her willingness to consent to the termination of her parental rights, and the petition was orally amended, without objection, to reflect this additional ground for granting the relief sought. Since Maria appeared to be confused as to the meaning and consequences of termination of parental rights, her consent was not accepted as a valid basis for court action. The petitioner then proceeded to offer evidence in support of the three nonconsensual grounds pleaded as set forth in Sec. 17-43a(b). After Maria offered testimony on her own behalf, all parties rested. Because of the absence of the intervenors, the matter was continued for a separate dispositional hearing originally scheduled for July 25, 1990, but thereafter continued another two months due to the unavailability of an expert witness to be called by the grandparents. A further two month continuance was thereafter required to complete all testimony as to disposition. On November 28, 1990 all parties rested and waived the filing of trial memoranda. At the request of the respondent mother, however, the matter was continued pending receipt of a report from the Counselling Center at New Britain General Hospital, where Maria was currently being treated, as to her present state of mental health, and all parties agreed that the period of reserved decision would be deemed to commence on the next court day following receipt of that document. It was received on December 28, 1990 so that the period of reserved decision began on January 2, 1990.
Facts
Evidence offered in three hearing days, interpreted in the light of the prior record in this court, of which judicial notice is taken, concerning the respondent mother's ability to care both for Christina and her two older half-siblings, supports the following findings of fact:
Christina D. was born October 20, 1986, the third child of her divorced mother, her two half-siblings, then nine and ten years old, being the products of Maria's marriage. Both of these children had been placed in DCYS foster care in 1983 as neglected children. In June of 1988, in the course of conducting a psychiatric evaluation in connection with an action to terminate her parental rights in one of the older children, Dr. Richard Sadler had had occasion to observe Christina who had accompanied her mother to the appointment. Concerned that the then 19-month old Christina was in the sole care of a mother whose unacknowledged and untreated mental illness caused her to be delusional and incapable of differentiating between reality and fantasy, he referred the child to DCYS predicting she, too, would be psychotic in a few years without intervention. DCYS then filed a petition CT Page 1369 alleging emotional and physical neglect. On November 2, 1988 a psychological evaluation was ordered. Five months later, after a number of appointments had been broken by Maria, a firm trial date was set for April 19, 1989. Although aware of that trial date, reminded of it that morning by the DCYS social worker, and represented by counsel, Maria failed to appear. Following a default trial, Christina was found to be both neglected and uncared-for in the sense of having special needs that could not be addressed in her mother's home. Although Christina was committed to DCYS at that time, no expectations for the mother to achieve in order to be reunified with her daughter were written out since Maria was not present in court. On April 21, 1989 Christina was placed in a foster home at a distance from Maria's most recent residences required in order to secure a specially trained foster family able to deal with the child's severe emotional and developmental lags. In its first treatment plan following commitment, DCYS noted that the foster parents had reported that on placement with them Christina lacked many basic skills: She did not know how to eat with utensils or play with simple toys; at two-and-a-half she was not toilet trained; she could speak in single words only and evidenced no experience in playing with other children. At the request of DCYS, a review in court was set for May 31, 1989 in order to execute written expectations for Maria to be explained to her on the record in the presence of her attorney. On that date Maria, who had neither visited Christina nor secured a place for herself to live, again failed to appear, and her attorney was requested to communicate these expectations to her: Visitation as often as DCYS permitted; securing a stable home; full compliance with her own psychiatric treatment.
Six months later, by the time of the second treatment plan following commitment, Maria's psychiatric condition appeared to be deteriorating. After an altercation in the DCYS office necessitated police involvement, she was told by the criminal court not to threaten DCYS social workers again. Despite her probation officer's attempt to clarify this prohibition according to its terms, Maria interpreted it to mean she was to have NO contact, even to request visits with her daughter or to respond to correspondence with DCYS. She thus failed to respond to many letters urging her to keep in touch with the social worker and to start visiting her daughter. The permanency plan articulated by DCYS in the treatment plan of December 18, 1989, therefore was to initiate a petition to terminate parental rights since Maria's ability to meet the child's needs appeared to be diminishing after eight months in foster care. Christina, on the other hand, was making significant gains in the foster home in the absence of parental contact. In less than a year, she had progressed from showing "significant delays" to being within average CT Page 1370 developmental limits. (State's Exh, D., pp. 1, 5.)
Maria failed to appear at the administrative review of this treatment plan. Since her reaction to this proposal thus could not be ascertained, only nonconsensual grounds for seeking the termination of her rights were pleaded in this petition.
In the year preceding the adjudicatory date for this petition (when it was last amended, May 30, 1990) Maria was given the opportunity to visit with her daughter in the DCYS office in Middletown, the assigned social worker agreeing to transport the child from the foster home upon request for this purpose. At the first scheduled visit that had been confirmed by letter in advance, only her parents had appeared. Three letters were sent to her in May of 1989 (State's Exh. A) at the motel where she was most recently known to be residing. None were returned. Soon after sending the last letter, which contained the court's expectations, Maria appeared, unannounced, at the DCYS office. Her behavior appeared to the social worker to be "out of control" (testimony of Anna Wiatri, May 30, 1990) and when she threatened to kill the social workers, their supervisor: called the police who arrived soon after Maria departed. During the next two months the social worker wrote four more times (State Exh. B), three letters being sent by certified mail for which Maria signed green cards. The social worker suggested visiting at least twice monthly, and urged Maria to contact her to discuss regaining Christina's custody. Maria finally requested a visit which was arranged for July 21, 1989 but again only her parents appeared. When another visit was arranged at Maria's request for August 9, 1989, Christina was brought to the Middletown office to see her mother who again failed to appear. Maria called the social worker on August 29, 1989 and, finding her out, left two telephone numbers. When the social worker attempted to return her call, she could not be reached at either number. She never contacted DCYS again.
Although informed by neither mother nor grandparents where Maria lived, the social worker, after calling various area shelters, learned that in September and October of 1989 Maria was at the South Park Inn in Hartford. Messages were left for her to call DCYS but no call was ever received. At the end of October, Maria left that shelter without informing DCYS. The social worker asked the maternal grandparents, Maria's probation officer, the Department of Income Maintenance and the various area shelters, but was unable to locate her again prior to the institution of this action in January of 1990. CT Page 1371
Throughout the year after Christina's commitment, Maria had no fixed address. A Department of Human Resources worker testified that housing services were discontinued for Maria in August of 1989 after she had been referred to eight different motels, following her eviction from her last apartment, all of which she rejected for different reasons. Her bizarre behavior (loud screaming and talking to herself) had led to complaints from other tenants at each location found for her, and she had refused referrals to psychiatric treatment as not being necessary. After this action was begun, she once again requested emergency housing on March 21, 1990, but when offered a shelter in Waterbury she declined it, saying that she preferred to be housed in a motel.
Testifying on her own behalf on May 30, 1990, Maria first stated that she had understood that she had no visitation rights after Christina's placement in April of 1989. Later, she acknowledged receiving the social worker's repeated letters urging her to visit: "I was very confused by those letters." Regarding her psychiatric condition, she testified that she saw a psychiatrist whenever she felt it necessary, but had not seen him for the 13 months preceding her testimony. According to Maria, the psychiatrist — whom she said she had found in the yellow pages — had told her that she did not need treatment and opposed her taking any medication: "He had passionate feelings toward myself." Asked why she was a recipient of Supplementary Social Security payments, she replied it was because she had had a colostomy or illostomy. The letter submitted to the court on December 28, 1990 from the psychiatric nurse clinician at New Britain General Counseling Center gave her current diagnosis as "Depressive Disorder . . . as well as Schizotypal Personality" and confirmed that she attended sessions regularly and was compliant with medications and treatment. Her involvement in this clinic followed two months of inpatient hospitalization at CVH. (State's Exh. C., addendum p. 3).
During Christina's first 18 months of life, she and her mother had lived in an apartment in a building owned and occupied by the intervening maternal grandparents. According to the grandmother's testimony of November 28, 1990, during that period the grandmother had done everything "for the child — fed, clothed and cared for her on a daily basis." A month after Maria moved out to live for the first time with Christina, independent of the grandparents, Dr. Sadler observed the child to be developmentally delayed, without language or socialization skills and in danger of psychosis if there were no clinical intervention. The grandmother apparently saw nothing amiss in Christina's condition during that period.
Clinical Evidence: In May of 1987, Dr. Sadler evaluated Maria CT Page 1372 in connection with the psychiatric hospitalization of an older child. He found her to be suffering from schizophrenia, incapable of minimally discharging adequate childcare responsibilities at that time, or at any time in the future. (State's Exh. A., neglect trial April 19, 1989, p. 13.) In that same interview, Maria had disclosed to Dr. Sadler instances during her childhood of physical abuse by her mother and sexual abuse by her father. (Id., p. 8.) A year later, in May of 1988, he found Maria essentially the same, ". . . able only to manage her own physical needs and . . . [showing] a marked inability to identify and to take needed action concerning the needs of others." (State's Exh. B., neglect trial, April 19, 1989, p. 4)
 . . . [Maria] continues to show evidence of a gross impairment in her ability to interact on an interpersonal basis. This is particularly noticeable in her severely impaired ability to form reasonable judgments concerning the needs of her children and to then appropriately respond to those judgments . . . [she] shows no significant change in her behavior or in her understanding or in her abilities from one year previously. (Id. p. 6 )
Dr. David Mantell, clinical psychologist, evaluated Maria and Christina in November of 1988 in connection with the neglect proceeding. In his report (State's Exh. D., neglect trial, April 19, 1989) Dr. Mantell came to the same conclusions as had Dr. Sadler in May of 1987 and May of 1988. Dr. Mantell found Christina to be ". . . emotionally neglected and developmentally delayed because of the mother's inability to interact with the child appropriately . . . [and] that the condition of the mother's mental state places the child at risk for continued neglect." (Id., p. 6) Seventeen months later, in March of 1990, Dr. Mantell found Christina to be "largely developmentally normal" exhibiting "a vast acceleration in her development following her separation from her mother, as was expected." (State's Exh. D., instant case, May 30, 1990, p. 5.) While he observed an easy and warm interaction between Christina and her grandmother, he noted the language barrier caused by the child's lack of "expressive Italian vocabulary" and the grandmother's apparent inability to understand much of the child's English. (Id. p. 3. ) Dr. Mantell recommended against adoption by the grandparents due to their ages and the "deteriorated physical condition of the grandfather" who had made no attempt to interact with the child. (Id., p. 5.) While a child with a normal developmental history of language might handle a transfer of caretaking to a family that spoke a different language, Christina — who, at 26 months, had had the expressive language development of only a 10 month old child CT Page 1373 (State's Exh. D., neglect trial, April 19, 1989, p. 5) — she was a year later "now at a point of major language growth which would be set back by language limitations of the grandparents." (State's Exh. D., instant case, May 30, 1990, p. 3.) The poor health of the grandfather was also a matter of concern, creating "an unnatural and difficult environment for such a young child, particularly at this critical and formative time of her life," (Id., p. 6) and considering that there were no children or younger adult members of the grandparents' household. In his testimony on September 26, 1990, Dr. Mantell expressed concern with the fact that during the first 18 months of Christina's life, although living in the same house with the child, seeing her daily, taking a major role in her care and acknowledging Maria's neglect of the child due to mental illness, the grandmother was unable or unwilling to intervene effectively. Thereafter, when Maria moved out and began her series of temporary motel sojourns, the grandparents, despite recognizing their daughter as "crazy", did nothing to protect the child. Dr. Mantell predicted that should Christina be placed with her grandparents, Maria would inevitably return to play a part in her life. This would be detrimental to Christina unless Maria's psychiatric condition improved, which it had not in the preceding three and a half years. While an average child might weather a transition to the home of relatives, Christina is not an average child. The "very severe incapacitating developmental delays" exhibited two years earlier made developmental issues "critical". While she had made up nearly all of those developmental deficits in a year of excellent foster care, she remains more vulnerable than an average child to losing important "life mastery skills". Dr. Mantell questioned the eleventh hour blossoming of the grandparents' interest in raising Christina, given their passivity in her first two and a half years while in the care of their mentally ill daughter, the infrequency of their visits during her first year in foster care — only four visits in twelve months despite being encouraged by DCYS to exercise visitation without limit. (Addendum to social study, State's Exh. C., p. 3) — and the clear disinterest of their son and daughter-in-law in sharing responsibility for the child: "It doesn't make ordinary psychological sense." In view of the "remarkable" progress Christina made in a year of foster care, Dr. Mantell found her need for safe, stable, continuous parenting outweighed any advantage that might be derived from placement with blood relatives.
Dr. Vittorio Ferrero, a bilingual child psychiatrist retained by the grandparents to evaluate their relationship to Christina, found the interaction of the child with the grandparents to be warm, evidencing a "strong bond" despite their infrequent visitation. He had not thought to ask them CT Page 1374 why they had visited so seldom when they had been offered unlimited visitation. Although the grandmother testified later (November 28, 1990) that if anything should happen to her, grandfather could care for Christina alone, Dr. Ferrero had been unequivocal that he could not do so. Dr. Ferrero expressed concern that the child needed protection from exposure to her mother and found the grandparents incapable of providing such protection if Maria "presented herself". He recommended, therefore, that the mother not be permitted to visit until the child was adequately prepared and the mother's psychiatric treatment confirmed. At the same time, he testified that he did not see how the grandparents could physically prevent Maria from having contact with Christina in their house. He recommended that Christina be placed with the grandparents only under continuing court orders restricting contact with the biological mother, presumably with the sanction of removing the child from their care if such orders were violated.
In preparation for his evaluation, Dr. Ferrero had been provided only with Dr. Mantell's evaluation of November 22, 1988 (State's Exh. D. and E., neglect trial of April 19, 1989) but not with Dr. Mantell's evaluation of March 15, 1990, (State's Exh. D., instant case, May 30, 1990) which had also included the grandparents, or with any of Dr. Sadler's evaluations going back to 1987 and 1988. Adjudication — on facts as of May 30, 1990, when the petition was last amended.
The total failure of Maria to visit her child, despite the repeated entreaties of the DCYS social worker, for a period of 13 months prior to the adjudicatory date constitutes clear and convincing proof of abandonment, not only within the definition of Sec. 17-43a(b) as the failure "to maintain a reasonable degree of interest concern or responsibility as to the welfare of the child", but also by the more stringent standards at common law. Maria's continues serious mental illness, signalled most recently by a two month hospitalization at CVH during the pendency of this proceeding, her failure to recognize the seriousness of her illness or the treatment it requires, her continued lack of housing and constant moving from motel to motel, shelter to shelter as well as her failure to visit her daughter in 13 months of foster placement constitutes clear and convincing proof of a failure to rehabilitate to the extent "as would encourage the belief that within a reasonable time, considering the age and needs of the child, . . . . [she] could assume a responsible position in the life of the child." In addition, whatever relationship may have existed between Maria and her daughter before commitment, (which both Dr. Sadler and Dr. Mantell had observed to be CT Page 1375 reflective of Maria's clear inability to parent any child at the time), after 13 months of no contact whatever it is a reasonable inference that by May 30, 1990 it would not have been the kind of relationship ". . . that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child." Given the mother's continued mental illness and inability to fully meet her own daily needs, it is both clear and convincing that "to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child" — particularly considering the marked developmental deficits she displayed after her first 26 months in her mother's care and the rapidity with which those deficits subsided after only a year in foster care.
The petitioner has thus supported its burden of providing clear and convincing proof of all three statutory grounds pleaded for the termination of Maria's parental rights.
Disposition — On facts as of the last day of hearing, November 28, 1990.
During the six months between the adjudicatory hearing on May 30, 1990 and the final day of trial, the grandparents visited only once or twice more despite the continuing absence of any restriction on such visitation. Since six visits to a child in foster placement might well support a finding of abandonment of a committed child (See In Re Shavaugh K.13 Conn. App. 91 (1987), it is not persuasive of an interest by the grandparents sufficient to support their request to be her permanent caretakers. The grandmother testified that her son would care for Christina should anything happen to her, despite the fact that the son had never once visited the child in 19 months of foster care. The grandmother felt that her husband, despite his physical infirmities, could care adequately for the child if both she and her son were unable to do so. She gave no reason for her failure to visit Christina more often, other than an aversion to seeing the child cry, or for her failing ever to take Christina to her own home for a visit although permitted to do so by the social worker. Maria was presently coming to visit her parents once or twice a week but if Christina were placed with them, according to the grandmother, they would not permit her ever to visit again. Asked what problems Maria had had raising Christina when living in the grandparents' home, the grandmother replied only "the screaming": "When she was not screaming, she was good." She had had no concerns or Christina's safety at that time because the child had not "understood" anything. The grandfather did not testify. CT Page 1376
Apart from the blood relationship and an easy, warm visiting relationship observed between Christina and her grandmother, there is no credible evidence in this record that permanent placement with the intervenors would benefit the child. Even Dr. Ferrero would require constant court intervention to ensure against unplanned contacts between Maria and the child, but that would necessitate the State of Connecticut becoming a permanent part of the child's life, thus precluding the permanency of an adoption. The grandmother saw no deficits in Maria's parenting of Christina (except for "the screaming"), apparently oblivious to the marked development lags in all areas so clear to both psychiatrist and psychologist. She also saw no reason why her husband could not adequately care for the child, although her own expert witness, Dr. Ferrero testified unequivocally that the grandfather was incapable of this responsibility. She would rely on her son to take over should she be unable to look after Christina, but her son — who had never visited Christina in foster care — had made it clear that he wanted nothing further to do with Maria and had no desire to assume any responsibility for her child. (Testimony of Social Worker Wiatr, November 28, 1990). Her explanation for the grandparents' infrequent visitation with Christina (five times in nineteen months) raises serious questions as to her present motivation for seeking the child's custody at this eleventh hour. Dr. Mantell, who had seen Christina when living with her mother, after living in foster care, and in a recent interaction with her grandparents, was clear in his recommendation that the child not be placed in the care of the relatives. In his opinion such placement would cause a serious regression in her belated language development, as well as expose her inevitably to contact with her mother which could only revive the negative impact this had had in her earliest years. All of the evidence, including the testimony of Dr. Ferrero, supports by clear and convincing proof the conclusion that the child's best interests will be served by severing the parental tie — and with it the legal tie to all relatives of the mother — thus permitting the child to consolidate and increase the impressive gains she has made with the present foster parents. If they do not become the adoptive parents, they can help her in a gradual transition to an adoptive home equally capable of meeting her psychological as well as developmental needs. Future contacts with the maternal grandparents may not prove to be harmful to the child once her placement is secured permanently, so long as such contact is welcomed by both the child and her permanent caretakers, but such contact should be that of a child with visiting grandparents, not that of a child and adoptive parents. The grandfather's physical disability, the grandmother's lack of insight into the child's needs, the CT Page 1377 grandparents' predicted inability to insulate the child from contact with Maria, the certainty of damage to Christina's delayed language development if placed with non-English speaking caretakers, and the lingering question of past abuse of Maria when she was a child living with her parents, all combine to compel the conclusion that any outcome other than termination of Maria's parental rights and the appointment of a statutory parent for the purpose of securing Christina a safe and nurturing permanent home would not serve her best interests. The grandparents' petition to revoke is, therefore,
Before ordering termination of a parent's rights, due consideration must be given to the six factors set forth in subsection (d) of Sec. 17-43a:
(1) Maria was repeatedly urged to follow through on her psychiatric treatment and to visit her daughter regularly. She did neither. No other services could be provided in this case, particularly when she had maintained no fixed address for over two years since April of 1988 when the child was 18 months old.
(2) No court orders were entered into, but the expectations specified at the time Christina was committed in April of 1989 failed altogether to be fulfilled.
(3) Christina can have no significant feelings or ties with a mother unseen for nearly the last third of her lifetime. She is significantly tied to her foster parents who have had her care for more than a year.
(4) Christina, at four, has only known the last year and a half of her life as a stable and nurturing time. Before that, her life with her mother was chaotic, deprived, and stunted — a condition her grandparents either did not recognize or were unwilling or unable to rectify. She needs the assurance of a stable nurturing permanent home before she is old enough to enter the wider world of school.
(5) Maria has done nothing to adjust her "circumstances, conduct or conditions" to make it in Christina's interests to return to her home. She has never visited the child despite being urged repeatedly to do so. She was psychiatrically hospitalized for two months as recently as during the pendency of this action and shows no more insight into her psychiatric condition now than she did three years ago.
(6) Nothing prevented Maria from maintaining a meaningful relationship with Christina except her own mental illness and her failure to keep in touch with the child after her placement in foster care. CT Page 1378
Having considered the foregoing, it is found by clear and convincing evidence to be in Christina's best interests for her mother's parental rights to be terminated, and for her to be freed and prepared for the possibility of placement in a permanent adoptive home. In the meantime, she will be assured that the lack of contact with her mother, which has enabled her to catch up developmentally while in foster care, may be legally assured. Therefore it is ORDERED that the parental rights of Maria D. in and to the child Christina D. be, and hereby are, terminated. And it is further ORDERED that the Commissioner of Children and Youth Services be appointed statutory parent for the purpose of placing the said child in adoption or permanent foster care, and that such Commissioner shall submit to this court in writing no later than 90 days following the date of this judgment a written report as to the progress toward such permanent plan. If the child is not then adopted, the said Commissioner is further ORDERED to submit by June 1, 1992 a Motion to Review Plan for Terminated Child to be heard in this court no later than 18 months following the date of this judgment.
Appeal
The mother has 20 days from the date of this judgment in which to seek an appeal. If, after being informed by trial counsel of the court's judgment and the right to take an appeal, she affirmatively manifests a desire to do so, if such trial counsel is willing to act in that capacity, the court will appoint him for this purpose. If she manifests a desire to take an appeal, and if trial counsel declines to represent the mother because in his professional opinion it lacks merit, such attorney is not required to do so but may file a timely motion to withdraw and to extend time in which to take an appeal. The court will then appoint another attorney to review this record who will, if willing to represent the mother on appeal, be appointed for this purpose. If the second attorney determines that there is no merit to an appeal, he or she is requested to make this known to the court at the earliest possible moment, and the mother will be informed by the clerk forthwith of the balance of the extended appeal period in which to secure her own counsel who, if qualified, may be appointed to represent her on the appeal. If this is not done, then upon expiration of the extended appeal period, the right to pursue an appeal will be ended and the termination of parental rights final. The child will at that time, and not before, be free to be placed in adoption.
If such procedures satisfy the sixth amendment right to counsel in criminal cases (Douglas v. California, 372 U.S. 353
CT Page 1379 (1963); Fredericks v. Reincke, 152 Conn. 501 (1965)), they are even more appropriate where there are interests of a third party involved: Those of the child whose need for permanent safe parenting is entitled to at least as great a degree of consideration as are those of the parent whose right to raise her is at issue. Even unsuccessful appeals delay permanent planning for years since no child may be adopted until the appellate process is exhausted. The need for finality of judgment in cases where the state initiates legal action against indigent respondents, which gave rise to the rule of Douglas and Fredericks, supra, applies as much or more to cases where the person affected by the judgment is a young child for whom passage of periods of time that may seem short for adults can work changes with lifetime implications.
Entered at Plainville this 15th day of February 1991
BRENNEMAN, JUDGE